OPINION OF THE COURT
Gerald Lebovits, J.
Petitioner, a cooperative corporation, has moved for sanctions under 22 NYCRR 130-1.1 (c) (3) against respondent Steven Lapidus, an attorney, for allegedly testifying falsely at his nonpayment trial on June 21, 2005. That trial ended in September 2005 with a final possessory and money judgment for petitioner. (See 1050 Tenants Corp. v Lapidus, NYLJ, May 15, 2006, at 18, col 1 [Sup Ct, NY County] [explaining, in collateral Supreme Court ejectment action, this court’s final judgment].) In August 2005, during the trial, this court found, although only in dictum, that Lapidus’s June 2005 testimony “defie[d] common sense” and was “false.” (See 1050 Tenants Corp. v Lapidus, 9 Misc 3d 1108[A], 2005 NY Slip Op 51455[U], *2 [Hous Part, Civ Ct, NY County, Aug. 10, 2005].) But this court granted petitioner’s motion for sanctions to the extent of ordering that a hearing be held to give Lapidus an opportunity to be heard as required by 22 NYCRR 130-1.1 (d) and, because Lapidus asserts that he never lied at trial, for the court to consider afresh the veracity of his testimony. (See 1050 Tenants Corp. v Lapidus, Hous Part, Civ Ct, NY County, Apr. 19, 2006, Index No. 99547/04, Lebovits, J.) The court also directed petitioner to notify Jeremy Krantz, Esq. — a former associate at Lapidus’s law firm, who represented Lapidus in 1999 — to testify at the hearing. (See id.)
Petitioner issued a subpoena for Krantz to testify on June 1,
2006. Krantz’s law firm and petitioner’s law firm exchanged letters about whether the attorney-client privilege covers Krantz’s prospective testimony. On June 1, Lapidus orally moved to quash the subpoena on the ground that Krantz’s testimony will violate his attorney-client privilege. The parties later submitted letter memorandums of law.
Lapidus’s motion to quash the Krantz subpoena raises two issues: first, whether Lapidus waived his attorney-client privilege and second, whether Krantz’s testimony should be allowed as self-defense. The motion is denied. Lapidus waived his attorney-client privilege when he testified about privileged communications at his nonpayment trial.
Petitioner argued at the nonpayment trial on June 21, 2005 that Lapidus withheld rent, or maintenance, in violation of a *1120 1999 stipulation that resolved the parties’ 1999 nonpayment proceeding. Lapidus ultimately agreed in this proceeding that he did not comply with the 1999 stipulation and that if the stipulation were binding, then Lapidus had no other abatement defense in this proceeding. To defend himself against petitioner’s argument that he was bound by that stipulation, however, Lapidus disavowed the stipulation and testified that he never saw, in its modified form, the stipulation that Krantz signed on his behalf; that he never agreed to the stipulation or its terms; that Krantz, violating his instructions, signed the stipulation without his permission; and that Krantz never told him that Krantz signed the stipulation or advised him that the stipulation was binding.
Lapidus’s testimony about the stipulation and his conversations with Krantz is recounted below. On June 21, 2005, at trial, when petitioner first alerted the court to the stipulation’s existence, the court spoke to Robert N. Fass, Esq., Lapidus’s then-trial attorney, while Lapidus was testifying:
“the court: Let me ask you a question and this is a really difficult question. You can talk to your client about it. You can think about it for a couple of minutes. You can step in the hallwayt,] whatever. Do you agree that if the agreement is binding to the extent that [if the court disagrees with] all objections you noted . . . then your client cannot raise an abatement defense [?]
“mr. fases]: May I have the two minutes Your Hon- or[?] Sorry.
“the court: . . . Yes, please, please. So let’s break for two minutes and see whether that’s the end of this trial.” (Transcript at 49, lines 16-25; at 50, lines 2-5.)
When Lapidus and Fass returned, the court asked Lapidus, who was still testifying, “You’re agreeing that this [stipulation] settled the [1999] case[?] That it was done by an associate [Krantz] and the associate had the power [to sign the stipulation on your behalf?]” (At 53, lines 6-8.) Lapidus asserted, “I don’t.” (At 53, line 9.) Thus, Lapidus disagreed that the stipulation resolved his nonpayment proceeding and said that he never authorized Krantz to agree to the stipulation.
Lapidus then testified to his knowledge of the stipulation. Fass asked Lapidus, “Were you ever served with a notice of entry with this order?” (At 63, lines 5-6.) Lapidus responded,
*1121 “Never. By the way I never saw until you [Mr. Fass] showed it to me, this so order[ed] [stipulation] or of course the tell tales.” (At 63, lines 7-9.) In reference to the stipulation, Lapidus also said:
“[T]here have been disputes after 1999 and no one has ever mentioned this document [the stipulation]. The first it was ever mentioned was, as I said, a week or so or three days ago. If you know the dispute .... [T]hat firm [petitioner’s law firm] has been involved in the other dispute and no one has ever mentioned this document. If this document, [unintelligible] okay if some other deal was made other than an . . . agreement this document would have been changed so I would sign it. I mean, it provides — there’s lines for me to sign and for the building [cooperative corporation] to sign. Somebody did that, I don’t know who. If there was a modification in writing I would have signed it or it would have been presented to me for me to sign.” (At 70, lines 4-20.)
“Whatever happened, as I said, it was settled with a $10,000 abatement. After that nothing happened with respect to this case. Nobody claimed this thing [the stipulation] existed. Nobody raised it in any other case. The first time I ever heard of it [the stipulation] and saw it in this form with the cross outs and the signatures is when Mr. Krantz, excuse me, I apologize .... Is when Mr. Fas[s] mentioned it to me in the last several days. I mean I don’t exactly know when maybe it was last week or it could have been before that but it was recently, sometime.” (At 75, lines 2-16.)
This testimony reflects that, according to Lapidus, Krantz never made him aware that he was subject to a binding stipulation and that Lapidus never signed, was asked to sign, or agreed to sign the stipulation.
Lapidus stated, moreover, that he told Krantz not to sign an earlier version of the stipulation and that Lapidus had not instructed Krantz that he would agree to a modified stipulation. Lapidus said: “Mr. Krantz if he signed this and if in fact this is an order overstepped the instructions that I gave and never informed me that this was modified, entered, signed and was binding on me.” (At 62, lines 22-25.) According to Lapidus, therefore, he did not know whether Krantz signed the stipula *1122 tion but that if Krantz had signed it, Krantz contradicted his instructions.
Given Lapidus’s accusations against Krantz and the effect that Krantz’s supposed misconduct concerning the 1999 stipulation might have at the 2005 trial, the court inquired without objection about Lapidus’s communications with Krantz. Lapidus said that he is so angry at Krantz for signing the stipulation that he is “close” to wanting to kill Krantz:
“the court: But didn’t you ask Mr. Krantz [,] [‘H]ey by the way what happened when you were in Court? [’]
“mr. lapidus: No, he told me it was settled. He said the case was settled.
“the court: But you’re a lawyer. Didn’t you ask— didn’t you ask to see a copy of the settlement?
“mr. lapidus: First of all, Your Honor, my understanding is to settle a case — like that case there didn’t have to be a document settlement^] [I]t could have been [agreed-to orally] on the record.” (At 67, lines 4-16.)
“mr. lapidus: Okay, and my understanding was that after I told Mr. Krantz that I wouldn’t agree to this and that I wouldn’t sign it and I didn’t sign it that that was off the plate and the case was settled with an abatement. With a couple of conditions, one is I would pay some money, they [the cooperative corporation] would give me an abatement and it happened.
“the court: But didn’t you think that there might be a rider [a written agreement supplementing the oral agreement]?
“mr. lapidus: Not after I told him I’m not signing it. He didn’t ask me to sign anything else.
“the court: But didn’t you — did you ask him[:]
[‘]So you settled the case[;] it was done orally on the record?[’]
“mr. lapidus: I didn’t — I’m sure I didn’t have those — I told him what to do, Your Honor, and I saw the fruits of my instruction.” (At 67, lines 24-25; at 68, lines 1-20.)
“A: I’m not signing this. $10,000 is ok but I’m not signing this.
“Q: Was there anything else said?
*1123 “the court: For the record, the [$] 10,000 refers to an abatement that you were to get?
“mr. lapidus: Correct
“the court: So you agree, that you should get an abatement but you didn’t agree to the other provisions?
“mr. lapidus: That’s correct, I agreed to settle the case with a $10,000 abatement. I had agreed to that before I ever saw this thing in the first place. When I saw this thing with all the stuff in it — all those provisions in it.
“the court: Yes
“mr. lapidus: I rejected it. I said this is not the deal.” (At 65, lines 19-25; at 66, lines 2-12.)
“the court: So I bet you’re ready to kill Mr. Krantz?
“mr. lapidus: Close.
“the court: Are you going to go to the disciplinary committee?
“mr. lapidus: I doubt it. I’m going to talk to him about it.” (At 70, lines 21-25; at 71, lines 2-3.)
Lapidus’s testimony at the 2005 nonpayment trial revealed his communications, and lack of communications, with Krantz. He testified that he told Krantz that the stipulation was not the agreement and that he rejected the stipulation. Lapidus defended himself by accusing Krantz of misconduct. Lapidus testified that, although he does not intend to seek disciplinary action, he plans to speak with Krantz to express his displeasure at Krantz’s overstepping his instructions.
In light of his testimony, the court finds that Lapidus waived his attorney-client privilege. Lapidus seeks to prevent Krantz from testifying, and possibly contradicting, Lapidus’s allegations of misconduct. To prevent Krantz from testifying would allow him to assert a privilege as both a sword and a shield.
This court adopts the test set out in Hearn v Rhay (68 FRD 574 [ED Wash 1975]) to determine whether Lapidus waived his attorney-client privilege. Although Hearn is a federal District Court decision not binding on this court, this court finds it persuasive.
The Hearn test is threefold. First, for a waiver to exist, the court must find that the “privilege was [waived as] a result of some affirmative act, such as filing suit, by the asserting party.” (Id. at 581.) Second, “through this affirmative act, the asserting *1124 party put the protected information at issue by making it relevant to the case.” (Id.) Third, “application of the privilege would have denied the opposing party access to information vital to his defense.” (Id.)
The Hearn test is sometimes criticized as allowing the privilege to be circumvented too easily. Some courts complain that the test’s third factor is too vague and overreaching and instead as a third factor allows exceptions “only when the reason for disclosure outweighs the potential chilling of essential communications.” (Metropolitan Life Ins. Co. v Aetna Cas. & Sur. Co., 249 Conn 36, 52, 730 A2d 51, 60 [1999].)
In question is whether Lapidus waived the privilege at his June 2005 trial.
The Hearn test’s first factor calls for waiver if the party asserting the privilege waives it affirmatively. At trial, Lapidus testified to his instructions to Krantz about the stipulation and accused Krantz of misconduct. Lapidus disagreed that the stipulation settled the case and that it was entered into by an associate who had the authority to do so. Lapidus also stated that he rejected the stipulation because it was not the agreement he wanted. If Krantz signed the stipulation and if the stipulation were an order, Lapidus explained, Krantz overstepped his instructions and, worse, never told him that the stipulation was modified, entered, signed, and binding.
Lapidus argues that his June 2005 testimony is insufficient to constitute an affirmative act. He claims that he testified only that he would not sign the stipulation and that the abatement should be $10,000. Lapidus’s comments went far beyond these two points. Additionally, discussing attorney-client conversations while defending a lawsuit is an affirmative act — as affirmative as discussing attorney-client conversations while prosecuting a lawsuit. The Hearn court itself declined to limit an affirmative act exclusively to its example of filing a lawsuit. In applying the “affirmative act” test, moreover, other courts have found that an affirmative act can include a variety of actions on the client’s part. (See e.g. Sanofi-Synthelabo v Apotex Inc., 299 F Supp 2d 303, 309 [SD NY 2004] [finding attorney-client privilege waived when party gave partial explanation for its conduct before Patent Office, because complete explanation was relevant to patent’s validity and might be contained in privileged communications]; Johnson Matthey, Inc. v Research Corp., 2002 WL 1728566, *2-4, 2002 US Dist LEXIS 13560, *11-12 [US Dist Ct, SD NY, July 24, 2002] [claim of fraudulent concealment placed *1125 in issue facts learned from counsel]; In re Kidder Peabody Sec. Litig., 168 FRD 459, 470-472 [SD NY 1996] [affirmatively using report waives attorney-client privilege about client statements given to attorney to prepare report].) Lapidus’s testimony accusing Krantz of misconduct is an affirmative act that fulfilled the Hearn test’s first factor.
The Hearn test’s second factor is whether the asserting party put the privileged information at issue. Lapidus put the privileged information into play at his 2005 nonpayment trial. At trial, the court asked Lapidus, and he ultimately agreed, whether, if the stipulation were binding, Lapidus had no other abatement defense. Lapidus then disavowed the stipulation. In doing so, he placed at issue his instruction and communication with Krantz about the stipulation. In rendering its decision in the 2005 nonpayment proceeding, this court found it irrelevant whether Lapidus testified honestly in attempting to disavow the stipulation. The court found the stipulation binding because Lapidus had never moved to vacate it and because Krantz had the apparent authority to sign it. (See 1050 Tenants Corp. v Lapidus, 9 Misc 3d 1108[A], 2005 NY Slip Op 51455[U], *2.) For that reason, the court found only in dictum that Lapidus testified falsely. But Lapidus did not know how the court was going to rule. He did not envision that the testimony he believed was so essential was so inconsequential to the court. Nevertheless, what counts is what the party asserting the privilege believes, not whether that belief is valid.
The Hearn test’s third factor is whether applying the privilege will deny the opposing party access to information vital to a defense. Petitioner would have been unable at trial to defend against Lapidus’s disavowing the stipulation had either Krantz not testified or the court not found Lapidus’s testimony irrelevant. No evidence other than Krantz’s testimony can better verify the truthfulness of Lapidus’s trial testimony. The alternative test offered in Metropolitan Life calls for waiver only when the reason for disclosure is greater than the possibility that communication between attorney and client will be discouraged. No viable alternative is available for Krantz’s testimony. The Metropolitan Life test is therefore also met. Upholding the privilege in this case would, accordingly, deny petitioner and the court access to information critical to deciding in this motion for sanctions whether Lapidus lied at trial.
All the Hearn test’s factors are met. Lapidus waived his attorney-client privilege by raising at his trial otherwise- *1126 protected and self-serving communications central to his defense of disavowing the 1999 stipulation, and now Krantz’s testimony is vital to ascertain Lapidus’s truthfulness.
Clients who disclose to their attorney some self-serving communications waive the privilege on the remainder of the communications. (E.g. Orco Bank v Proteinas Del Pacifico, 179 AD2d 390, 390 [1st Dept 1992, mem].) A client may not disclose beneficial, privileged information and at the same time insist that the remaining information stay privileged. (Hunt v Blackburn, 128 US 464, 470-471 [1888].) The Hunt court explained that “the privilege is that of the client alone, and no rule prohibits the latter from divulging his own secrets. And if the client has voluntarily waived the privilege, it cannot be insisted on to close the mouth of the attorney.” (Id. at 470.) Lapidus may not disclose during a nonpayment trial privileged information he believed was helpful to his defense and now insist that Krantz’s testimony stay privileged at a sanctions hearing being held to determine the veracity of his testimony about his communications with his attorney.
Because this court resolves respondent’s motion on the basis of waiver, this court need not address whether Krantz’s testimony should be allowed as self-defense. (See Code of Professional Responsibility DR 4-101 [c] [4] [22 NYCRR 1200.19 (c) (4)].) Petitioner relies on General Realty Assoc. v Walters (136 Misc 2d 1027, 1029 [Civ Ct, NY County 1987]) in which the court found that the tenant’s former attorney could testify to defend against the tenant’s claim in her landlord-tenant dispute that her former attorney withheld information from her. This court finds General Realty unpersuasive; the attorney-client privilege issue in that case could have been decided on waiver, just as this court resolves the same question on waiver. It was unnecessary for the General Realty court to rule on whether the attorney had the right to testify to defend himself against the tenant’s accusations.
As the District Court noted in Louima v City of New York (2004 WL 2359943, *73 n 95, 2004 US Dist LEXIS 13707, *224 n 95 [US Dist Ct, ED NY, Oct. 5, 2004]), the client in General Realty had already waived confidentiality in her landlord-tenant dispute by putting into controversy an attorney-client communication, and therefore the General Realty court did not need to consider whether the attorney could testify to defend himself.